```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
```

BARBARA BRAXTON,                )
                                )
        Plaintiff,               )
                                )
v.                              )        1:12CV1232
                                )
CAROLYN W. COLVIN,              )
Acting Commissioner of          )
Social Security,                )
                                )
        Defendant.              )


## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, DISTRICT JUDGE.

Plaintiff Barbara Braxton ("Ms. Braxton") commenced this action on November 16, 2012 requesting judicial review of a final decision of the Commissioner of Social Security denying her claim for Social Security disability benefits. (Doc. 1.) Before the Court are cross-motions for Judgment on the Pleadings filed by the parties, respectively. (Docs. 9, 14.) The Court heard oral argument by counsel for the parties on their motions on March 3, 2015. For the reasons set forth below, the Court reverses the decision of the ALJ and remands the case to the Commissioner for an award of benefits to Ms. Braxton.

I. **Procedural History**

On October 13, 2004, Ms. Braxton filed an application for disability insurance benefits and supplemental security income

alleging a disability beginning on September 14, 2001. (Tr. at 74-78, 417-420.[1]) Following a denial initially and upon reconsideration by the Social Security Administration, Ms. Braxton requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on June 30, 2008. (*Id.* at 46-55, 442.) On September 2, 2008, the ALJ issued a decision denying Ms. Braxton's disability application. (*Id.* at 439-50.) Ms. Braxton appealed this decision to the Appeals Council for review, and the Appeals Council remanded the matter to the ALJ on July 7, 2010. (Tr. at 452-56.) In its remand order, the Appeals Council directed the ALJ to, among other things, give further consideration to the treating and non-treating source opinions pursuant to 20 C.F.R. §§ 404.1527, 416.927, Social Security Rulings 96.2p, 96.5p, and non-examining source opinions pursuant to 20 C.F.R. §§ 404.1527(f), 416.927(f), Social Security Ruling 96-6p, and to explain the weight given to such opinion evidence. (*Id.* at 455.) On February 10, 2011, a second hearing was then held by the ALJ, and in a decision dated June 21, 2011, the ALJ found that Ms. Braxton was not disabled prior to January 13, 2009 (*id.* at 14, 19), but did conclude that Ms. Braxton became disabled on January 13, 2009 due to a change in her age category under Rule 202.06 of 20 C.F.R. § 404, Subpart P, Appendix 2. (Tr. at 33-35.) Ms. Braxton once again requested

---

[1] The transcript citations refer to the certified administrative record.

that the Appeals Council review the ALJ's decision, and on October 11, 2012, her request was denied, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 9.)

## II. Standard of Review and ALJ Process

This Court's review of the Commissioner's denial of benefits is authorized under 42 U.S.C. § 405(g). *Hancock v. Astrue,* 667 F.3d 470, 471 (4th Cir. 2012). The scope of review, however, is extremely limited. *Frady v. Harris*, 646 F.2d 143, 144 (4th Cir. 1981). The role of the reviewing court is not to "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)(second alteration in original). Rather, the court must uphold the Commissioner's factual findings if they are supported by substantial evidence and are free of legal error. *Hancock*, 667 F.3d at 471. Substantial evidence is such "evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). It is considered more than "a scintilla of evidence" but is less "than a preponderance." *Id.* "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Johnson,* 434 F.3d at 653 (alteration in original)).

In evaluating disability claims, the Commissioner uses a five-step process. *Hancock*, 667 F.3d at 472. In sequence, the

3

Commissioner asks "whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to [his or her] past relevant work; and (5) if not, could perform any other work in the national economy." *Id.* The claimant bears the burden of production and proof in steps one through four; the burden shifts to the Commissioner in step five "to produce evidence that other jobs exist in the national economy that the claimant can perform considering [his or her] age, education, and work experience." *Id.* at 472-73. Before going from step three to step four, the Commissioner assesses the claimant's "residual functional capacity" ("RFC"), a determination of what the claimant is capable of doing. The RFC is used at step four and at step five when the claim is evaluated at those steps. 20 C.F.R. § 404.1520(a)(4). If the ALJ finds that the claimant has failed to satisfy any step of the process, the ALJ need not proceed to the next step. *Hancock*, 667 F.3d at 472-73 (citing 20 C.F.R. § 404.1520(a)(4)).

### III. **The Decision of the ALJ**

The ALJ found that Ms. Braxton had not engaged in substantial activity since the onset date through the date she was last insured (step one); had the following severe impairments: disorders of the cervical spine and lumbar spine; osteoarthrosis and allied disorders; and mood disorders (step two); and that Ms. Braxton's

4

impairments, alone or in combination, did not meet or equal a listed impairment (step three). (Tr. at 22-27.)

The ALJ then determined that Ms. Braxton had the RFC to perform light work, except as follows: lift/carry 10 pounds frequently and 20 pounds occasionally; can stand/walk/sit 6 hours in an 8 hour workday, with normal breaks; she should avoid frequent ascending or descending stairs; can perform frequent pushing/pulling motions with her upper and lower extremities within the aforementioned weight restrictions; can perform frequent but not constant activities requiring bilateral manual dexterity for both gross and fine manipulation with reaching and handling; she retains the ability to climb, balance, stoop, crouch, kneel and crawl without restrictions; and, due to her mental impairments, she requires work that is low stress (non-production oriented) simple, unskilled work activity requiring only one, two, or three step instructions. (*Id.* at 28-29.)

The ALJ determined that Ms. Braxton was unable to perform any past relevant work (step four) for the period prior to January 13, 2009, but considering her age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that she was able to perform (step five). (*Id.* at 33.) These included the light jobs of stock checker, laundry classifier and cleaner, and sedentary jobs such as order clerk and information clerk. (Tr. at 33-34.) Further, the ALJ

5

determined that, beginning January 13, 2009 when her age category changed, Ms. Braxton became disabled by application of Medical Vocational Rule 202.06. (*Id.* at 35.) Thus, the ALJ concluded that Ms. Braxton was disabled beginning January 13, 2009 for the reasons outlined above but that, based on her RFC, she was not disabled prior to that time.

## IV. Discussion

Ms. Braxton challenges the ALJ's finding that she had the RFC to perform "frequent but not constant activities requiring manual dexterity for both gross and fine manipulation with reaching and handling." In particular, Ms. Braxton contends that the ALJ erred by relying on the opinion of the non-examining state consultant, Dr. Caviness, whose opinion he assigned great weight, while giving less than controlling weight to the opinion of Dr. Emrich, Ms. Braxton's treating physician.

A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c). If an opinion is not given controlling weight, the ALJ applies the following factors to determine the weight to give the opinion: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4)

6

the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c)(2). Irrespective of the weight given to the treating physician's opinion, the ALJ must be sufficiently specific to make clear to the court the reasons for giving that weight to such opinion. SSR 96-2(p), 1996 WL 374188, at *5. Conclusory reasons for rejecting a treating physician's opinion are not sufficient to overcome the deference given to the opinion of a treating physician. *Radford v. Colvin*, 734 F.3d 288, 295-96 (4th Cir. 2013); 20 C.F.R. § 404.1527(c).

Here, even though the ALJ had been instructed by the Appeals Council, upon remand, to explain the weight given to the medical source opinions, the ALJ failed to do so. The ALJ merely stated that the opinion of Ms. Braxton's treating physician, Dr. Emrich, was "out of proportion with the remaining objective medical evidence contained in the record and [was] not given controlling weight." (Tr. at 32.) Though the ALJ provided a considerable list of select facts related to Ms. Braxton's medical history, "[a] fact summary, no matter how detailed, *is not analysis*." *St. James v. Commissioner of Social Sec.*, No. 13-10574, 2014 WL 1305032, at *7 (E.D.Mich. Feb. 4, 2014) (emphasis added). Nor is it a "logical bridge from the evidence to his conclusion." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). In other words, there is no substitute for the requirement that the

7

ALJ provide the specific reasons supported by the evidence in the record for the weight given to the medical opinions in the record. *See* SSR 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. § 404.1527(c)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Of particular note is the fact that the Appeals Council in its 2010 remand order instructed the ALJ to give further consideration to the medical opinions and to explain the weight given to such opinion evidence. (*See* Tr. at 455.) A necessary predicate to engaging in substantial evidence review is a record that adequately explains the ALJ's findings and reasoning using the established five-step process. *Radford*, 734 F.3d at 295. Thus, the ALJ's failure to provide specific reasons for the weight given to the medical opinions is error in that it hampers the ability of this Court to evaluate whether the ALJ's findings are supported by substantial evidence.

After carefully reviewing the entire record, which this Court is obligated to do, the Court finds that the treating physician's opinion is well-supported by the medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *See Bass v. Colvin*, 2015 WL 225412, at *1 (W.D.Va. Jan. 16, 2015) ("Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ." (quoting *Gordon v. Schweiker*, 725

8

F.2d 231, 236 (4th Cir.1984))). The record contains several references to, and treatment for, Ms. Braxton's severe bilateral osteoarthritis in her hands. Indeed, as far back as July of 2001, Ms. Braxton complained of pain at the base of her thumb, and a Duke University medical record noted that she "had a positive grind test in her right hand with subluxation of her right thumb and early disease on the left." (Tr. at 190.) X-rays and examinations from this time period also showed "CMC [carpometacarpal] arthritis with a large spur" on her hand and "markedly decreased pinch strength" in the right upper extremity with the left showing signs of weakness as well. (*Id.* at 190, 209.)

In early 2003, the record shows that Ms. Braxton continued to experience degenerative changes in her hands. A nurse practitioner at UNC Hospitals noted that examination of her hands revealed "pain with extension, flexion, and lateral movement of both her thumbs with palpable tenderness at the base of both of her thumbs, right greater than left." (*Id.* at 322-23.) In February of 2003, x-rays from Triangle Orthopedic demonstrated "narrowing of the CMC joints with early subluxation and osteocyte formation, right greater than left." (*Id.* at 239-40.) Upon examination, it was noted that Ms. Braxton had "positive CMC compression test bilaterally; negative Finkelstein bilaterally; decreased grip strength right upper extremity compared to the left[.]" (*Id.* at 239.) Examination of Ms. Braxton at Triangle Orthopedics in March of 2003 revealed a

9

positive CMC compression test bilaterally and decreased grip strength bilaterally. (*Id.* at 231.) At that visit, Ms. Braxton was told that aside from injections,[2] surgery or immobilization were the only options for treating her thumb pain. (*Id.*) Ms. Braxton reported that she would contact them in the future when she was ready to proceed with surgery. (*Id.*)

Even though Ms. Braxton wore splints and took anti-inflammatory medication, by September of 2003, the record indicates that the pain in her right thumb had escalated to the point where it interfered with her daily activities, prompting discussion about surgery. (*Id.* at 208, 231, 236.) Notably, there are a number of references to surgery as an option for treatment of Ms. Braxton's hand impairments, although she declined surgery out of concern for how invasive the surgery would be and the uncertainty of its success.[3] (*See id.* at 207, 296, 326-28.) Near the end of 2003, Ms. Braxton still had a positive CMC compression test and markedly decreased pinch and grip strength. (*Id.* at 209.)

In late 2004, state consultant Dr. Elkins performed a consultative examination of Ms. Braxton, and x-rays of her hands

---

[2] Ms. Braxton testified that "[t]hey did an injection, like, a pad with gel with these little needles that would sit there. And that made it extremely worse. So they said I had a bad reaction to it, and they discontinued to do that. That was at Triangle Orthopedics." (Tr. at 552.)

[3] Ms. Braxton testified that "they wanted to remove the joint, extract the tendon from my forearm, roll that up to make a joint, drill a hole in the base of my thumb, reattach my thumb to my hand with my tendon, which would stretch; which would have to be repeated at least every five years, and it would be maimed." (Tr. at 551-52.)

demonstrated arthritic changes at the thumbs around the trapezium bone, and she had weak pinch and grip bilaterally in her hands. (Tr. at 249-53.) There was also enlargement of both her carpometacarpal joints with "generalized tenderness around the joint." (*Id.*) In August of 2005, the nurse practitioner at UNC Hospitals documented that Ms. Braxton had been suffering from ongoing bilateral hand pain with bony abnormalities present for the past three years. (*Id.* at 308.) Ms. Braxton was referred to Dr. Bynum with UNC's Hand Clinic. (*Id.*) X-rays from her September, 2005 visit with Dr. Bynum showed "significant bilateral thumb CMC degenerative changes (left greater than right) with radial subluxation." (*Id.* at 301.) Dr. Bynum's assessment was bilateral basilar thumb degenerative joint disease. (*Id.*) On March 10, 2005, a vocational evaluation was done on Ms. Braxton to assess her employment options. (Tr. at 121.) As Ms. Braxton was using a pen during the evaluation, the counselor observed that "[s]he stopped every five minutes to rest her hand. She never voiced complaints while working, but her body language, including facial grimacing and stiffness of motion, made it evident she was suffering." (*Id.* at 124.)

Contrary to the ALJ's characterization of Dr. Emrich's medical opinion as out of proportion with the evidence in the record, Dr. Emrich's opinion is consistent with her own treatment of Ms. Braxton as well as the other substantial, well-documented

medical evidence detailing Ms. Braxton's hand impairments and limitations. (*See id.* at 190, 296-97, 300-302, 311-312, 328-330, 333.) A December 10, 2007 note by Dr. Emrich at UNC Healthcare stated that she had been seeing Ms. Braxton for the last two years as her primary care physician, and Ms. Braxton "has been suffering from severe osteoarthritis in her hands that has been progressing to the point that she is unable to enjoy or perform normal daily activities." (*Id.* at 333.) On October 29, 2008, Dr. Emrich found, among other things, that Ms. Braxton was limited in her ability to push and pull using her hands, explaining that Ms. Braxton "has severe osteoarthritis in her hands, neck, and back making any repetitive activities very painful. Also any lifting small items is limited due to small joint disease of hands." (*Id.* at 498.) Significantly, Dr. Emrich opined that Ms. Braxton was limited in reaching in all directions, handling, fingering, and feeling. (*Id.* at 499.) In explaining her reasoning for noting these limitations, Dr. Emrich wrote that Ms. Braxton "has a lot of arthritis in her hands making fine motor manipulations very painful. Physical therapy has stopped doing any fine motor skills with her due to pain." (*Id.* at 499.)

Although the Commissioner maintains that the opinion of Dr. Caviness, as a non-examining state agency physician, that Ms. Braxton could handle and finger frequently but not constantly is consistent with the other state agency physicians' findings, his

12

opinion is not consistent with the other substantial clinical and diagnostic evidence demonstrating Ms. Braxton's long-standing, well-documented, and consistently-reported impairments to her hands and the resulting difficulties she experiences. Accordingly, there is not substantial evidence to support the ALJ's RFC decision to accord the non-examining physician's opinion greater weight than that of the treating physician, Dr. Emrich, whose opinion is well supported by the record. In addition, because Dr. Emrich's opinion was well supported by the record, it should have been given great if not controlling weight.

**V. Remand for Further Proceedings or for an Award of Benefits**

Ordinarily, the appropriate remedy where the ALJ fails to provide specific reasons for his findings is to remand with instructions for the ALJ to clarify his ruling. *See Radford*, 734 F.3d at 295-96. Whether to remand for further consideration or for an award of benefits is within the sound discretion of the district court. *Richardson v. Colvin*, No. 8:12–cv–03507-JDA, 2014 WL 793069, at *20 (D.S.C. Feb. 25, 2014). An award of benefits is more appropriate when the Commissioner has had an opportunity to develop the record on the issue in question and has failed to do so. *Richardson*, 2014 WL 793069, at *20. Likewise, an award of benefits is appropriate when there is substantial evidence establishing a claimant's disability and remand would only further

delay receipt of benefits while serving no useful purpose. *Id.* (citing *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984)).

Ms. Braxton's application for benefits has been pending in the agency and courts for almost eleven years now. The ALJ was instructed back in 2010 to provide the specific reasons for the weight given to the medical source opinions, but failed to do so. Further, the vocational expert testified that if Dr. Emrich's opinion reflected Ms. Braxton's functional capabilities, then there would be no work for her to perform at the unskilled level. (Tr. at 564-65.) For this Court to remand, as did the Appeals Council, with instructions for the ALJ to explain the basis for the weight he accorded to the medical source opinions would be futile and will result in further delay of Ms. Braxton's receipt of benefits, as there is substantial evidence to support her claim for benefits both before and after 2009. *See id. See also Breeden v. Weinberger*, 493 F.2d 1002, 1011 (4th Cir. 1974)(concluding that an award of benefits instead of remand is appropriate "where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose.").

For the reasons outlined, the Court reverses the decision of the ALJ and remands this case to the Commissioner with instructions to award benefits to Ms. Braxton from her onset to January 13,

2009. Nothing in this opinion shall be construed to affect the award of benefits to Ms. Braxton beginning January 13, 2009.

**VI. Order**

**IT IS THEREFORE ORDERED** that the decision of the ALJ denying Ms. Braxton's benefits from onset to January 13, 2009 is hereby **REVERSED** and the Commissioner's Motion for Judgment on the Pleadings (Doc. 14) is **DENIED**, Ms. Braxton's Motion for Judgment on the Pleadings (Doc. 9) is **GRANTED** and the case is **REMANDED** to the Commissioner for an award of benefits consistent with this opinion.

This, the 11th day of March, 2015.

                                  /s/ Loretta C. Biggs
                                  United States District Judge